VINCENT H. D. ABBEY and VIOLET M. ABBEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abbey v. Commissioner
Docket No. 173-80.
United States Tax Court
T.C. Memo 1981-673; 1981 Tax Ct. Memo LEXIS 72; 42 T.C.M. (CCH) 1723; T.C.M. (RIA) 81673; November 23, 1981. Wayne R. Parker, for the petitioners. Michael R. McMahon, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $ 34,362.25 in petitioners' Federal income tax for 1975 and an addition to tax under section 6651(a) [1] in the amount of $ 1,718.11. The issues for decision are: 1. Whether petitioners' repayment in 1975 of a $ 68,098.40 bank loan made to a corporation in which petitioner Vincent H. D. Abbey was a shareholder entitled them to a business bad debt deduction under section 166(a) or a loss deduction under section 165(a) and (c) or, as respondent *74 contends, only to a nonbusiness bad debt deduction under section 166(d); and 2. Whether petitioners are liable for an addition to tax under section 6651(a) for the late filing of their 1975 income tax return. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Vincent H. D. Abbey and Violet M. Abbey, husband and wife, resided in Seattle, Washington, at the time they filed their petition. They filed a joint Federal income tax return for 1975 with the Internal Revenue Service Center, Ogden, Utah. Violet M. Abbey is a petitioner only because she filed a joint return with her husband, Vincent H. D. Abbey (hereinafter pertioner or Abbey). Petitioner has been involved with the Seattle Totems, a minor league ice hockey team, since its inception in 1958. The team was organized in 1958 by the Seattle Totems Hockey Club, Inc. (Totems, Inc.), a Washington corporation. The team was a member of the Western Hockey League (WHL), and petitioner served continuously as an officer (as president, vice president, or secretary), director, and shareholder of Totems, Inc. From April 1972 to September 1974, petitioner owned 22.22 percent of Totems, Inc. capital *75 stock while his brother-in-law, Dr. Eldred Barnes (Barnes), also owned 22.22 percent. [2]
The WHL was comprised of the Totems and several other teams in cities on the west coast of the United States and in Western Canada. The WHL originated in 1912 and it or a like entity operated at least until 1974. Distinct from the WHL is the National Hockey League (NHL), which constitutes the major league in ice hockey. From 1958 to 1967, it was comprised of six teams located in Boston, Chicago, Detroit, Montreal, New York, and Toronto. In 1967, the NHL added six more cities (Los Angeles, Minneapolis, Philadelphia, St. Louis, Pittsburgh, and San Francisco-Oakland). After 1967 the NHL expanded in stages. Two more teams, Vancouver, British Columbia, and Buffalo, were added in 1970; in 1972, Atlanta and Long Island, New York, acquired major league teams; and in 1974, Kansas City and Washington, D.C., joined the *76 NHL. Three of these teams--Vancouver, San Francisco-Oakland, and Los Angeles--were WHL participants before they were added to the NHL. The NHL expansion harmed the minor league teams because recruitment of players for the major league diminished the talent available for minor league teams. Likewise, the minor league team revenues decreased while the costs in player salaries and travel increased. This combination drove the Totems and the remaining WHL teams into insolvency. Because the NHL teams depended upon the minor league teams to provide training and talent, an agreement (the "White Paper" agreement) was made in 1972 between the WHL teams, including the Totems, and the NHL, whereby the NHL guaranteed the independent minor league teams' operating expenses. The NHL also agreed to offer to the WHL member clubs the opportunity to purchase at least one-half of the new franchises it granted after the 1974-1975 season. Each WHL team agreed that, should it obtain a NHL franchise, it would indemnify the remaining minor league teams. The Seattle franchise was terminated in December 1971, whereupon the franchise was turned over to the WHL which operated it for approximately 3 months *77 in a trust relationship. Then, in February 1972, Northwest Sports Enterprises, Ltd. (Northwest), a Canadian corporation, located in Vancouver, B.C., obtained ownership of 55.56 percent of Totems Inc. stock. Northwest operated the Vancouver Canucks, one of the NHL teams from the 1970 expansion; the Totems became the Canucks' development team. This majority ownership by a NHL member precluded Totems, Inc. from relying on the White Paper agreement, because by the NHL only to independently owned clubs, that is, clubs not owned 50 percent or more by a NHL member club. Northwest could continue, under its franchise, to operate the Totems as long as the Totems remained a minor league operation. Under NHL rules, however, an organization could own only one NHL team. Thus, should a major league franchise be granted to Seattle, Northwest would be forced to divest itself of its majority stock interest and of the territorial rights of the Totems. [3] In a contract dated in May 1974, petitioner and Barnes agreed that, if a NHL franchise was granted for Seattle, they would purchase Northwest's shares of Totems, Inc. stock. *78 a conditional franchise was awarded to Seattle by the NHL in June 1974. The conditions on which the franchise was granted involved arranging adequate financing, procuring a business lease, repaying Northwest's loans to Totems, Inc., and indemnifying then existing WHL teams pursuant to the White Paper agreement. In accordance with the May 1974 agreement, petitioner and Barnes endeavored to obtain from Northwest its Totems, Inc. stock so that it could be held by the Totems as treasury stock. On September 6, 1974, a loan of $ 146,429 was made by People National Bank of Washington (Peoples Bank) to Totems, Inc. for the purchase of the stock owned by Northwest. The note was cosigned by petitioner, Barnes, and Robert M. Arwine (Arwine). Arwine signed purely as an accommodation party because Barnes was not a Washington resident. On September 6, 1974, petitioner forwarded Totems, Inc.'s check for $ 146,429 to Northwest. A $ 10,000 payment was made on the note on September 6, 1974. That payment is not in issue in this case. On November 5, 1974, the note from Totems, Inc. was rewritten in the amount of $ 136,429 in the names of petitioner, Barnes, and Arwine. The November note *79 was renewed with a note for $ 136,209.91 on January 6, 1975; the January note was renewed with a note for $ 136,196.79 by petitioner, Barnes, and Arwine on March 7, 1975. The March note was renewed on June 9, 1975, with a note for $ 136,196.79 signed only by petitioner and Barnes. On December 31, 1975, the June note was paid, one-half ($ 68,098.40) by petitioner. Northwest's stock certificates were never transferred to Totems, Inc., or to petitioner and Barnes. Instead, they were retained as security for certain indebtedness. Various negotiations were necessary in order for the conditional franchise of June 1974 to be made absolute. To meet the numerous heavy obligations, petitioner dealt with a number of banks, including Peoples Bank from which the $ 146,429 loan was obtained He also had an attorney draft a limited partnership agreement. He intended to use the limited partnership structure for running the major league franchise. Negotiations with the NHL required considerable time and expense, as petitioner traveled to some NHL meetings and has his attorney make other trips. Petitioner spent approximately 25 percent of his time in 1972 trying to obtain the franchise; the *80 percentage of time increased to 50 percent in 1973, and approximately 100 percent in 1974 and 1975. [4] Diferent proposals were considered, including purchasing the Pittsburgh and Oakland teams as well as developing an expansion team. Finally, on April 3, 1975, a letter defining the NHL's conditions [5] was sent to petitioner from William Jennings, president of the New York Rangers and chairman of the Expansion Committee of the NHL. Petitioner was unable to fulfill the conditions and, despite the lengthy negotiating efforts, the Seattle conditional franchise was withdrawn by the NHL in June 1975. Petitioner continued to pursue a franchise, and engaged in some negotiations after June 1975. These negotiations also proved fruitless. In November 1975, petitioner and Barnes, along with the Seattle *81 Totems, commenced an antitrust action in the U.S. District Court of the State of Washington against the NHL and all its member clubs, including Northwest, and certain individuals; a second suit was filed in the U.S. District Court of Minnesota for jurisdictional reasons. Northwest, in turn, initiated legal proceedings in Vancouver, B.C., in the Supreme Court of British Columbia in order to enforce the collection of funds from petitioner and others under the May 1974 agreement, a sum alleged to be approximately $ 2,700,000. This case has been stayed by a district court injunction, which has been appealed to the Court of Appeals for the Ninth Circuit. Petitioner deducted the $ 68,098.40 he repaid to Peoples Bank in full as a loss. Respondent denied the deduction and determined that the payment was a nonbusiness bad debt and thus deductible only as a short-term capital loss. Respondent also determined that petitioner is liable for an addition to tax under section 6651(a). OPINION Petitioner and Barnes, two of the three shareholders of Totems, Inc., cosigned along with Arwine a note given by Totems, Inc. to obtain a bank loan. The loan was intended to enable Totems, Inc. to *82 acquire the Totems, Inc. stock held by Northwest, the third shareholder of Totems, Inc., so that the stock could be converted to treasury stock and resold to investors. The acquisition of the stock held by Northwest, also, was necessary to qualify Totems, Inc. for a franchise under NHL rules because Northwest held the Vancouver Canucks franchise. Totems, Inc.'s financial situation subsequently deteriorated and the note was once rewritten and thrice renewed by petitioner and Barnes without the signature of Totems, Inc. Finally, petitioner paid $ 68,098.40 as his share of the payment required to discharge the note and here claims the payment as either a business bad debt under section 166(a) [6] or an individual loss incurred in a trade or business under section 165(a) and (c)(1). [7]
*83 We hold that petitioner's deduction of the $ 68,098.40 is allowable only as a nonbusiness bad debt deduction under section 166(d). [8] That section defines the term "nonbusiness debt" to mean a debt other than a debt created or acquired in connection with a trade or business of a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. In the form in which it was in effect in 1975, the section provided that the loss from the worthlessness of such a debt "shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." *84 The 1939 Code predecessor of section 166(d) was applied in , in which the facts were analagous in many respects to the facts in the instant case. Putnam, a lawyer, and two other individuals formed a corporation and each of them owned one-third of its stock. Putnam advanced funds to the corporation and guaranteed the payment of some of the corporation's indebtedness. He was required to pay a bank loan which he had guaranteed, and he claimed an ordinary loss deduction under the 1939 Code predecessor of section 165(a) and (c)(2). The Supreme Court rejected the claim, holding that the predecessor of section 166(d) applied. The Court stated () that Putnam's discharge of his obligation as a guarantor created a debt by subrogation and that the statutory scheme of the predecessors of sections 165 and 166 "is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." [9] The business of the corporation could not be attributed to Putnam, one of its shareholders.
*85 Similarly, the loss here in issue was incurred by petitioner in his capacity as a Totems, Inc. shareholder and as a guarantor of Totems, Inc.'s loan from Peoples Bank. The parties have expressly stipulated that the bank made the loan to Totems, Inc., that Totems, Inc. received the loan proceeds, and that Totems, Inc.'s check was forwarded to Northwest, the third shareholder of Totems, Inc., for the purchase of Northwest's stock in Totems, Inc. The parties have further stipulated that the Peoples Bank note was "cosigned" by petitioner, Barnes, and Arwine. The petition filed in the instant case, signed and verified by both petitioners, states that "the $ 68,098.40 [which is here in dispute] was loaned" to Totems, Inc., and that petitioner, "along with others, signed as a personal guarantor of the loan." These statements were admitted in the answer. Thus, petitioner incurred the $ 68,098.40 obligation to Peoples Bank in his capacity as one of Totems, Inc.'s shareholders, not in connection with any trade or business in which he was engaged. Therefore, his payment to discharge his obligation as a "personal guarantor" of the loan is not deductible as a business had debt under *86 section 166(a) or as a loss incurred in a trade or business under section 165(a) and (c)(1) but only as a nonbusiness bad debt under section 166(d). ; , affd. per curiam ; , affd. per curiam , cert. denied ; see . The fact that Totems, Inc. was not a party to the renewal notes does not alter the situation. [10] The result is the same whether the transaction is viewed as a loan from Peoples Bank to Totems, Inc., guaranteed by petitioner and Barnes, or as a loan by them directly to Totems, Inc. As explained in , the essence of , "was to protect the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing. *87 " See also , cert. denied . The language of section 166(d) covers "not only any loss sustained by the obligee of the debt but also any loss sustained by a third party, whether acting as surety, guarantor, or indemnitor." , affg. . As stated by the Supreme Court in Putnam (): There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same, and are accomplished by * * * [section 166(d)]. Petitioner seeks to escape the broad sweep of Putnam and to meet the trade or business provisions of section 166(d) by contending that he and Barnes were partners in a venture designed to bring a professional hockey *88 team to Seattle. He contends that the bank loan was actually made to their partnership and that the partnership incurred a loss from its operations, measured by the amount paid to Peoples Bank to discharge the loan and deductible by them as partners. We think that the idea that a partnership existed between petitioner and Barnes is an afterthought which came too late. Petitioner has not shown that he and Barnes were partners in 1974 and 1975. Contrary to the partnership argument, it is stipulated that, from April 1972 until September 6, 1974, when the $ 146,429 check was forwarded to Northwest to cover the purchase of its shares in Totems, Inc., the stock of Totems, Inc. was owned 22.22 percent each by petitioner and Barnes and 55.56 percent by Northwest. Thus, petitioner's and Barnes' stock in Totems, Inc. was not owned by a partnership of which they were members but by them as individuals. We have pointed out that it is also stipulated that Peoples Bank made the loan to Totems, Inc., not to a partnership. Further, as noted above, the petition in this case, verified by both petitioners, alleges and the answer admits that the bank loaned the $ 68,098.40 to Totems, Inc., not *89 to a partnership, and that petitioner, along with others, "signed as a personal guarantor of the loan." Thus, petitioner's partnership argument is contrary to stipulated facts as well as facts alleged and admitted in the pleadings. Moreover, other objective facts of record show that a partnership between petitioner and Barnes did not exist in 1974 and 1975. On petitioner's income tax return for 1975, the disputed deduction was not taken as a partnership loss but as a "Miscellaneous Deduction," simply termed "Loss: Peoples Natl. Bank Loan of Seattle Totems." There is no evidence that petitioner and Barnes filed a partnership return in either 1974 or 1975. The petition contains no allegations as to a partnership between petitioner and Barnes, [11] nor do any of the papers executed during its supposed existence. The bank loan statements refer to making a loan to Totems, Inc. with the individuals cosigning. And, as argued by respondent and admitted by petitioner, the alleged partnership-- *90 had no assets, equipment, capitalization, player contracts, league, books and records, office, telephone, business licenses and permits, stadium lease, television and radio contracts, partnership tax returns, employer identification number, employees, insurance, bank accounts or line of credit. Petitioner simply has not shown that a partnership existed between himself and Barnes in 1974 and 1975. ; Rule 142. The tardily erected partnership facade does not shield petitioner from Putnam's reach. Petitioner relies heavily upon , [12] in which an attorney was allowed a business bad debt deduction for a $ 50,000 loan made to him personally, the proceeds of which he advanced to a partnership in which he was a partner. The taxpayer's argument was that his activities as a partner were sufficient to meet the trade or business exception to section 166(d). However, our finding that petitioner and Barnes were personal guarantors of the bank loan to Totems, Inc. and were not acting as partners in the transaction renders that case inapposite. *91 Petitioner attempts to establish the existence of a trade or business in which he was engaged by pointing to his extensive involvement with Totems, Inc.'s efforts to establish a hockey team in Seattle. Petitioner undoubtedly devoted considerable time, energy, and money in attempting to procure a hockey franchise for Seattle. But he acted on behalf of Totems, Inc., a corporation in which he was a shareholder. As explained by the Supreme Court in , after an extensive review of decided cases: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. * * * Based on all the evidence, we find that petitioner has not shown that he guaranteed or paid the $ 68,098.40 loan in or in connection with any trade or business in wich he was engaged. The last issue for decision concerns petitioners' liability for an addition to tax for the late filing of their 1975 income tax return under section 6651(a). [13] It is uncontested that, because of an extension, petitioners' income tax return was due on June 15, 1976. Petitioners maintain *92 that, because the return filed by them bears the handwritten date of June 15, 1976, and because respondent has produced no evidence showing a later actual filing, that no addition to tax can be imposed. We hold that respondent properly imposed the addition to tax under section 6651(a). The income tax return, while signed June 15, 1976, clearly bears the Internal Revenue Service's stamp showing the date of receipt as June 21, 1976. The record contains no evidence as to the date on which the return was mailed. [14] Petitioners offered no evidence of reasonable cause for failure to file the return on time. As petitioner bears the burden of proving respondent's error in determining that the addition to tax is due, , *93 Rule 142(a), we sustain respondent's determination. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
2. It is stipulated that petitioner and Barnes each held 22.22 percent of the stock. According to petitioner's testimony, however, his 22.22 percent share was actually owned by himself and his wife while Barnes' 22.22 percent share was likewise owned by Barnes and his wife.↩
3. The Totems signed a joint affiliation agreement between the NHL and the WHL, by which the signatory clubs recognized that each of the NHL teams controlled professional hockey within 50 miles from the center of the city in which it was located. The NHL in turn agreed to recognize the territorial rights of the WHL cities.↩
4. In 1975, petitioner estimates that he spent 100 percent of his time attempting to acquire the franchise up until Nov. when he shifted his energies to an antitrust suit brought against the NHL.↩
5. Attached to the letter were drafts of some required agreements, including a franchise agreement, a collateral security agreement, an escrow agreement, and certain promissory notes.↩
6. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
7. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business;↩
8. Sec. 166(d) provides as follows: (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
9. The Court cited and quoted from , which held that the predecessors of secs. 165, relating to losses, and 166, relating to bad debt losses, are mutually exclusive: The making of the specific provision as to debts indicates that these were to be considered as a special class and that losses on debts were not to be regarded as falling under the * * * general provision [for losses].↩
10. Totems, Inc. had reached the point where it had no assets or credit. Placing Totems, Inc.'s signature on the notes would have been an empty formality.↩
11. We recognize, as petitioner points out, that Washington law does not require formalities for partnership formation. Wash.Rev. Code Ann. secs. 25.04.060 and 25.04.070 (1969). Partnerships may be formed orally and may result from action or conduct provided, however, that the partners prove their intention to carry on a business in partnership. . Petitioner has failed to prove such an intention.↩
12. For a brief analysis of , see McKee, Nelson, and Whitmire, 1 Federal Taxation of Partnerships and Partners, sec. 13.02[1], p. 13-8 (1977).↩
13. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, * * *↩
14. Petitioners made no effort to meet the timely-mailing-timely-filing requirements of sec. 7502(a).↩